UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

CHARLOTTE MARSHALL MICHAELS,

                                  Plaintiff           DECISION AND ORDER

-vs-

                                                  1:19-CV-0306 CJS

COMMISSIONER OF SOCIAL
SECURITY,
                                  Defendant.
_____

INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security ("Commissioner" or "Defendant") which denied in part the application of Charlotte Marshall Michaels ("Plaintiff") for Social Security Disability Insurance ("SSDI") benefits. The Commissioner found that Plaintiff was not disabled prior to September 30, 2018, but that she was disabled thereafter. Now before the Court is Plaintiff's motion (ECF No. 8) for judgment on the pleadings and Defendant's cross-motion (ECF No. 11) for the same relief. For the reasons discussed below, Plaintiff's application is denied, Defendant's application is granted, and this action is dismissed.

STANDARDS OF LAW

The Commissioner decides applications for SSDI benefits using a five-step sequential evaluation:

> A five-step sequential analysis is used to evaluate disability claims. *See* 20 C.F.R. §§ 404.1520, 416.920. First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If

1

> he is not, the Commissioner next considers whether the claimant has a severe impairment which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in the regulations [or medically equals a listed impairment].   Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity [("RFC")] to perform his past work.[1]  Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.   The claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at step five.

*Colvin v. Berryhill*, 734 F. App'x 756, 758 (2d Cir. 2018) (citations and internal quotation marks omitted)

An unsuccessful claimant may bring an action in federal district court to challenge the Commissioner's denial of the disability claim.   In such an action, "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C.A. § 405(g) (West).   In relevant part, Section 405(g) states that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."

The issue to be determined by the court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are

---

[1] Residual functional capacity "is what the claimant can still do despite the limitations imposed by his impairment." *Bushey v. Berryhill*, 739 F. App'x 668, 670–71 (2d Cir. 2018) (citations omitted); *see also*, 1996 WL 374184, Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996).

2

based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *see also, Barnaby v. Berryhill*, 773 F. App'x 642, 643 (2d Cir. 2019) ("[We] will uphold the decision if it is supported by substantial evidence and the correct legal standards were applied.") (citing *Zabala v. Astrue*, 595 F.3d 402, 408 (2d Cir. 2010) and *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).").

"First, the [c]ourt reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard." *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *see also, Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) ("[W]here an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ. Failure to apply the correct legal standards is grounds for reversal.") (citation omitted).

If the Commissioner applied the correct legal standards, the court next "examines the record to determine if the Commissioner's conclusions are supported by substantial evidence." *Tejada v. Apfel*, 167 F.3d at 773.   Substantial evidence is defined as "more than a mere scintilla.   It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation omitted).

> The substantial evidence standard is a very deferential standard of review—even more so than the 'clearly erroneous' standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder would have to conclude otherwise." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original). "An ALJ is not required to discuss every piece of evidence submitted, and the failure to cite specific evidence does not indicate that such evidence was not considered. *Id.*

3

*Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), as amended (Apr. 30, 2019) (internal quotation marks omitted).

In applying this standard, a court is not permitted to re-weigh the evidence. *See, Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016) ("Krull's disagreement is with the ALJ's weighing of the evidence, but the deferential standard of review prevents us from reweighing it."); *see also, Riordan v. Barnhart*, No. 06 CIV 4773 AKH, 2007 WL 1406649, at *4 (S.D.N.Y. May 8, 2007) ("The court does not engage in a *de novo* determination of whether or not the claimant is disabled, but instead determines whether correct legal standards were applied and whether substantial evidence supports the decision of the Commissioner.") (citations omitted).

FACTUAL and PROCEDURAL BACKGROUND

The reader is presumed to be familiar with the facts and procedural history of this action. The Court will refer to the record only as necessary for purposes of this Decision and Order.

Plaintiff claims to have become disabled on July 24, 2014, due to a combination of physical and mental impairments, namely "chronic neck and back pain, chronic hip pain, left ankle pain, PTSD, a traumatic brain injury, depression, chronic migraines, and gastrointestinal issues."[2] Plaintiff was previously a member of the U.S. Armed Forces, playing piano in both the United States Marine Corps Band and the United States Navy Band.[3]

---

[2] Administrative Transcript at pp. 37–38.
[3] At the administrative hearing, Plaintiff testified that her impairments have essentially caused her to lose

4

In 1983 and 1994, while in the military, Plaintiff claimed to have sustained post-traumatic stress disorder ("PTSD") as a result of being sexually assaulted by other members of the military, though the treatment record contains very little information about those incidents or about any treatment that Plaintiff received following them.

In 2005, while Plaintiff was still in the Navy, she was involved in an MVA, in which she was seated and belted in a parked car that was struck from behind by a larger vehicle. Plaintiff sustained injuries to her neck, shoulder and back, as well as a subdural hematoma. Plaintiff received rehabilitative treatment over a two-year period, and claims to have residual limitations from the incident. In particular, Plaintiff claims to have chronic pain in her neck and back, as well as cognitive impairments from the brain injury. Physically, Plaintiff claims to have chronic pain, difficulty walking and navigating stairs, and difficulty with balance, resulting in falls. Mentally, Plaintiff claims to suffer

---

interest in life, and that after leaving the military she no longer found enjoyment in playing music. The ALJ, seemingly skeptical about Plaintiff's testimony, due to notations in medical records indicating that Plaintiff continued to play piano despite her claimed limitations, pressed her on that point. Plaintiff, though, insisted, alternatively, that she was no longer able to play the piano "well" and that she did not play at all, either because it "no longer brings [her] any joy because [she] was let go [from the military in 2007] for not being able to perform [her] duties" or because she does not "have the recall that [she] had before." Plaintiff also testified that since a motor vehicle accident ("MVA") in 2005, she does not do well "interacting in public," and that she is bothered by flashing lights and "ambient noise." However, the Court has been informed, based on information outside of the record, that Plaintiff, who evidently performed in the Navy Band using the name "Marshall Michels,"(see, e.g.
https://www.youtube.com/watch?v=BhfkKd5y4H0 Great Lakes U.S. Navy Jazz Band featuring Marshall Michels on piano) has, since leaving the military and to the present, continued to perform under that name in various bands, with and without with her sister, Karen Izbinski, who submitted a third party functional statement to the Commissioner, indicating that Plaintiff is essentially unable to engage in any activities. (see, e.g., https://www.youtube.com/watch?v=saLPtpueWj4 Marshall Michels Band; https://www.kickstarter.com/projects/1003989722/never-been-blonde-1st-cd-stars-in-vegas Never Been Blonde Band; https://www.bandmix.com/miss-americana/ Miss Americana Band). It is not the Court's function in this action to determine whether that information, which was not disclosed to the Commissioner, is correct. The Court merely points out that if the information is correct, it would seriously call into question the truthfulness of both Plaintiff's claim and the functional report submitted by Ms. Izbinski. While this may be a matter for the Commissioner to explore, it does not affect the Court's ruling here.

5

from memory loss and "aphasia" (difficulty speaking and using language).[4]

Plaintiff told a doctor that the "chief symptoms" of her cognitive deficits are that she sometimes loses her direction while driving, even in familiar locations, and that she has difficulty choosing the correct words when speaking.[5] Plaintiff similarly testified at the administrative hearing, held on October 15, 2018, that she has aphasia, that she becomes disoriented when driving, and that she is unable to play the piano due to cognitive limitations and a loss of interest.   However, on January 19, 2017, Plaintiff reportedly told her doctor that she had no difficulty with driving, and that she was considering pursuing advanced study in piano: "She denied any problems with managing her finances or with driving. . . .   She spends her free time playing the piano and would like to return to school to study piano performance."[6]

In 2007, Plaintiff was discharged from the military.   Plaintiff has indicated that she was forced out of the military against her wishes, due to impairments from her MVA. In that regard, Plaintiff reportedly told a doctor that after the accident her musical timing was less precise.[7]   The record indicates that the Navy classified Plaintiff as disabled due to her MVA, though the majority of that disability was attributed to PTSD from the MVA, as opposed to physical or cognitive limitations.[8]   In 2009, a Navy doctor who had treated Plaintiff between 2005 and 2007 opined that Plaintiff was permanently disabled.[9]

---

[4] *See, e.g.*, Administrative Transcript at p. 1306 ("she has trouble with cognition incl aphasia, memory changes."). Aphasia involves the ability to communicate and use language.
[5] Administrative Transcript at pp. 518, 524. (Treatment note dated March 7, 2016).
[6] Administrative Transcript at p. 1477.
[7] Administrative Transcript at p. 1215.
[8] Administrative Transcript at pp. 754, 1061, 1223.
[9] Administrative Transcript at pp. 371–372.

Plaintiff receives monthly disability benefits from the military.

Nevertheless, after separating from the military, Plaintiff worked in various capacities, including as a part-time pianist for a church and briefly as a training analyst for a pharmaceutical company.

Plaintiff also apparently pursued additional education. In that regard, Plaintiff reportedly told her doctor that in 2012, she earned her second master's degree, in "Systems Engineering," with a GPA of 3.8.[10] The Court pauses here to observe that, while this information is contained in a medical note, it does not appear that Plaintiff otherwise disclosed the information to the Commissioner. Indeed, when the ALJ asked Plaintiff at the hearing whether she had any academic degrees, she mentioned only an undergraduate degree in Communications.[11] The ALJ seems to have been unaware of the notation regarding Plaintiff's master's degrees, which is not surprising given that the administrative transcript is approximately 1600 pages in length.

In any event, in 2012, after apparently earning her master's degree in Systems Engineering, Plaintiff was hired for a six-figure position as a technical writer for a firm that provided barcode computer services to 114 different countries.[12] In that capacity, Plaintiff was responsible for analyzing the company's technical documentation to make sure that it was accurate.[13] As noted earlier, at the administrative hearing, when the ALJ asked Plaintiff about her educational degrees, Plaintiff mentioned only an

---

[10] Administrative Transcript at p. 1476 ("Charlotte Michaels is a single, right handed female. She reportedly completed two master's degrees, most recently in systems engineering in 2012, with a 3.8 GPA.").
[11] Administrative Transcript at p. 46.
[12] Administrative Transcript at pp. 48-49.
[13] Administrative Transcript at pp. 48–50.

undergraduate degree in Communications.   The ALJ therefore expressed curiosity at how Plaintiff had obtained the technical skills to perform the technical writer's job.   Once again, though, Plaintiff did not mention having earned a master's degree in Systems Engineering after leaving the military.   Rather, Plaintiff indicated that she had essentially taught herself to use computers while in the military:

> ALJ: Where did you acquire the skill set to work with these different software programs and analytical abilities?
>
> CLAIMANT: Because in the military, you are not only a musician, but we are a self-supporting unit and I was the training advisor and career counselor, command career counselor for our unit.   So there are software programs where we monitor recruitment, separation, retirements and I did all of that work in addition to my usual skills, performing.

Administrative Transcript at pp. 67–68.   Similar to the matter discussed in footnote 3 above, the Court has no way of knowing from the present record whether Plaintiff's hearing testimony was false, or her statement to the doctor was false or falsely reported.   Although, the likelihood of it having been falsely reported by the doctor seems low, given the specificity of the notation.[14]   The Court merely points out that this seems to be a significant discrepancy that the ALJ missed.   While this is perhaps a matter for the Commissioner to explore, it does not affect the Court's ruling here.

Plaintiff's technical writing job ended in 2014.   According to Plaintiff, the job ended because she was being sexually harassed by her employer.[15]   Plaintiff indicates

---

[14] Similar to the ALJ's reaction, it also strikes the Court as improbable that Plaintiff would have been hired for such a highly technical position while having only a bachelor's degree in communications.
[15] There is also an entry in a treatment note by a different treatment provider in which Plaintiff reportedly stated that she was "let go" from that same job because she had been "unable to do the work." Administrative Transcript at p. 1306.

that she initially left work to enter an in-patient clinic for two weeks for unspecified treatment, and that while she was in such treatment, the company terminated her employment. Although, there is no evidence in the record of such in-patient treatment. Plaintiff told one of her doctors that she was fired after she filed a discrimination complaint.[16]   At the administrative hearing, the ALJ asked Plaintiff whether she had pursued legal action against the employer, and Plaintiff indicated that she had consulted an attorney *prior to* being terminated, but had decided not to pursue legal action and had returned to work, only to be later terminated.[17]   Consequently, Plaintiff testified that she had never actually pursued legal action against the employer.   However, on February 23, 2017, Plaintiff reportedly told a doctor that she was still embroiled in a stressful discrimination lawsuit against her former employer.[18]

Since 2014, Plaintiff maintains that she has not engaged in any type of work activity, for pay or without pay, or any type of volunteer work.[19]

On or about September 17, 2015, Plaintiff claims that she lost her balance and fell in her driveway, spraining her back.[20]   Based on this occurrence, Plaintiff pursued a grant through the Veteran's Administration to have her driveway paved.   On June 16, 2015, Plaintiff reported that her pain had improved and that she was able to garden and do things around the house.[21]   A mental status examination performed that same day

---

[16] Administrative Transcript at p. 1477 ("[S]he was reportedly fired after filing a claim of sexual harassment.").
[17] Administrative Record at pp. 71–72.
[18] Administrative Transcript at p. 1305.
[19] Administrative Transcript at p. 50 (Plaintiff indicated that she has not worked anywhere, for anyone, for any amount of money).
[20] Administrative Transcript at pp. 541–42, 548, 552, 554.
[21] Administrative Transcript at p. 631.

provided normal results, with "no dysarthria/aphasia," though the examiner indicated that Plaintiff took extra time following commands and seemed to lose her train of thought.[22]

In February 2016, Plaintiff maintains that she slipped and fell while shopping in a military post exchange at Fort Dix. Plaintiff indicated that she slipped and fell forward onto her wrists, resulting in wrist pain, increased headaches, back pain and neck pain.[23]

In connection with receiving treatment for her various ailments, Plaintiff's doctors have made various observations about her mental and physical functioning. On April 7, 2015, a doctor noted that Plaintiff had "balance and mild cognitive, mild weakness issues."[24] On April 21, 2015, a doctor reported a normal mental status examination, and specifically indicated that Plaintiff had "fluent speech, no dysarthria/aphasia."[25] Various doctors have reported that Plaintiff walks with a steady, normal gait, and without a cane,[26] though some doctors have reported observing her limp and use a cane.[27]

Sometime between 2016 and 2018, Plaintiff moved to Buffalo. Prior to that actual move, Plaintiff had frequently traveled between Buffalo, where her twin sister resides, and New Jersey, where she was residing. Plaintiff indicates that she now lives in Buffalo, in her sister's home, and that her sister essentially cares for her and performs all household chores for her, including laundry. Plaintiff, and her sister, who submitted

---

[22] Administrative Transcript at p. 631.
[23] Administrative Transcript at pp. 833, 837–38, 843
[24] Administrative Transcript at p. 469.
[25] Administrative Transcript at p. 475.
[26] Administrative Transcript at pp. 542, 567, 581, 856, 884, 1002, 1042, 1069.
[27] Administrative Transcript at pp. 1005, 1156, 1234

a third-party functional statement, both essentially indicate that Plaintiff is incapacitated and has limited activities.

On October 29, 2018, the ALJ issued a partially-favorable decision, finding that Plaintiff was not disabled at any time between the alleged disability onset date and September 29, 2018, but that she became disabled on September 30, 2018.[28] Applying the familiar five-step sequential evaluation set forth earlier, the ALJ found that: Plaintiff had not engaged in substantial gainful activity since the alleged onset date; Plaintiff had severe impairments consisting of degenerative disc disease of the neck and low back, osteoarthritis of the left ankle, PTSD, major depressive disorder, obsessive-compulsive disorder, panic disorder, and status post-traumatic brain injury; Plaintiff's impairments, either singly or in combination, did not meet or medically equal a listed impairment; Plaintiff had the RFC to perform

> light work as defined in 20 CFR 404.1567(b) except she can occasionally climb ramps or stairs; can occasionally balance and stoop; can never kneel, crouch, or crawl; and can never climb ladders, ropes, or scaffolds. She can understand, remember, and carry out simple instructions and tasks; cannot perform supervisory duties or independent decision-making; can have no strict production quotas; and can tolerate minimal changes in work routine and processes.

Administrative Transcript at p. 17; Plaintiff was not able to perform her past relevant work; prior to the date last-insured, September 30, 2018, considering Plaintiff's age, education, work experience and RFC, there were other jobs that she could perform; however, as of the date last-insured, Plaintiff's age category changed, from "individual

---

[28] The ALJ, the Hon. Stephen Cordovani, issued his decision following a hearing at which Plaintiff appeared with her attorney, and at which both Plaintiff and a vocational expert ("VE") testified.

closely approaching advanced age" to "individual of advanced age," and therefore she was classified as disabled under the grids, from September 30, 2018 onward.

Plaintiff contends that the ALJ's determination must be reversed, insofar as it found that she was not disabled prior to September 30, 2018, because it contains legal error and is not supported by substantial evidence. As discussed more fully below, Plaintiff alleges that the ALJ's "mental RFC determination finding was not supported by substantial evidence."[29]

The Commissioner disputes Plaintiff's contentions and maintains that the ALJ's decision is free of legal error and supported by substantial evidence.

## DISCUSSION

Plaintiff contends that the mental aspect of the ALJ's RFC finding is not supported by substantial evidence. In connection with this argument, Plaintiff purports to explain her current alleged inability to work in a manner that minimizes the obvious obstacle to her claim of disability, namely, the fact that she worked full-time between 2012 and 2014 in a highly technical and demanding position despite her alleged impairments. Specifically, Plaintiff states:

> In the case at hand, Plaintiff suffered from PTSD due to sexual trauma and physical trauma that occurred during military service. Although she had been able to work after her military service, her symptoms caused occupational difficulty and were exacerbated significantly by harassment she faced by a supervisor. She was ultimately unable to work, and was deemed totally and permanently disabled by the Department of Veteran's Affairs, significantly in part due to her PTSD.

---

[29] Pl.'s Memo of Law, ECF No. 8-1 at p. 11.

Thus, Plaintiff asserts that she became disabled after her *condition worsened* due to the harassment by her supervisor in or about 2014. However, the Court must point out that this narrative mischaracterizes the record in several respects.

First, Plaintiff only vaguely contends that she was sexually harassed while working as a technical writer between 2012 and 2014, and therefore the nature and circumstances of that alleged harassment are unclear. Additionally, the Court recalls seeing no indication or opinion that Plaintiff's pre-existing PTSD was "exacerbated," let alone "exacerbated significantly," by such alleged harassment. Nor does the Court recall seeing any evidence that Plaintiff's impairments "caused occupational difficulty" while she worked as a technical writer. Nor, for that matter, does the record seem to indicate that Plaintiff's condition worsened after 2014. Moreover, there does not appear to be any connection between such alleged harassment and the military's decision to classify Plaintiff as disabled. Indeed, it does not appear that the persons who made that decision on behalf of the military were aware that Plaintiff had engaged in other work after leaving the Navy in 2007.

For example, on March 4, 2014, in connection with Plaintiff's military disability claim, she was examined by Veteran's Administration psychiatrist Hillary Tzetzo, M.D. ("Tzetzo"). Tzetzo indicated that Plaintiff had "occupational and social impairment with deficiencies in most areas, such as work, school, family relations, judgment, thinking and/or mood."[30] Tzetzo indicated that 95% of such limitations were attributable to Plaintiff's claim of PTSD, while only 5% seemed to be attributable to her brain injury

---

[30] Administrative Transcript at p. 1169.

from the MVA. Indeed, Tzetzo indicated that any impairments related to the brain injury were few and minor,[31] even though Plaintiff reportedly told Tzetzo that she had debilitating chronic headaches "2-3 times per week."[32] Tzetzo opined that Plaintiff would have difficulty working. Interestingly, though, it does not appear that Tzetzo was aware, when she performed the evaluation, that Plaintiff was at that moment actively employed as a full-time technical writer earning $115,000 per year. Rather, Tzetzo seems to have believed that Plaintiff had not worked since being discharged from the military in 2007. Nor does it appear that Tzetzo was aware that Plaintiff had, in 2012, earned a second master's degree, in Systems Engineering. For example, when asked to describe Plaintiff's "relevant occupational and educational history," Tzetzo wrote only: "Vet had been a musician (piano, mainly) in military. Her 'timing' – musically speaking – was less precise, following her 1/05 [traumatic brain injury] (secondary to MVA)."[33]

In contrast to Tzetzo's examination, on January 19, 2017, Veteran's Administration psychologist Kerry Donnelly, Ph.D. ("Donnelly") performed a full psychological examination, but she, unlike Tzetzo, was aware that Plaintiff had completed her master's degree in systems engineering, On that point, Donnelly stated in pertinent part: "She reportedly completed two master's degrees, most recently in systems engineering in 2012, with a 3.8 GPA. . . .  This was a mostly normal cognitive exam. . . . Her high achievement in a demanding master's program in 2012 offers

---

[31] Administrative Transcript at pp. 1176–1179.
[32] Administrative Transcript at p. 1182.
[33] Administrative Transcript at pp. 1170–1171.

further evidence of her cognitive integrity."[34]   Moreover, unlike Tzetzo, Donnelly specifically mentioned that Plaintiff had worked as a Technical Writer between 2012 and 2014.   Donnelly essentially concluded that Plaintiff had symptoms of PTSD, depression and anxiety, but no significant cognitive deficits, and that it was likely that Plaintiff's emotional turmoil was responsible for her perception that she was having cognitive difficulties.[35]   Of course, at that point Plaintiff had already been declared disabled by the military, and Donnelly was not being asked to revisit that determination. Nevertheless, Donnelly did not express any opinion that Plaintiff would be unable to work, or that she would be unable to "return to school to study piano performance," as Plaintiff had told Donnelly she was interested in doing.

Furthermore, the Veteran's Administration declared Plaintiff "100% disabled" on or before June 17, 2014, when Plaintiff was still employed full-time as a technical writer.[36]   Plaintiff continued working full-time until August 2014,[37] when she claims she was fired for reasons unrelated to her alleged disability.

In sum, Plaintiff's contention that she was declared disabled by the military in 2014 after her PTSD worsened and she became unable to work, due to harassment that she suffered between 2012 and 2014, is simply not supported by the record. Rather, it appears that the military declared Plaintiff disabled, primarily due to PTSD attributed to events that occurred in and before 2005, and based primarily on Plaintiff's

---

[34] Administrative Transcript at pp. 1476–1478.
[35] Administrative Transcript at p. 1478.
[36] Administrative Transcript at p. 217.
[37] Administrative Transcript at p. 319.

uncorroborated subjective complaints of her symptoms, as well as on evaluations by doctors who seemingly were not aware that following her separation from the Navy in 2007 she had earned a master's degree (with high honors) and maintained full-time employment.

     Nevertheless, Plaintiff contends that the ALJ's mental RFC finding is unsupported by substantial evidence, because the ALJ did not properly weigh the medical opinions.   In particular, Plaintiff contends that the ALJ should have given more weight to the opinion of one-time examiner Tzetzo, discussed above, and less weight to the opinions of two non-examining physicians/analysts, Ellen Gara ("Gara") and Robert Campion, M.D. ("Campion").   In this regard, Plaintiff contends that the opinions of Gara and Campion cannot amount to substantial evidence, since those individuals did not personally examine Plaintiff.   Plaintiff further contends that the opinions of Gara and Campion were "stale," since they were rendered prior to the receipt of certain Veteran's Administration records, including the opinion of Tzetzo.   Plaintiff also alleges that the ALJ erred when he "essentially found Plaintiff's mental impairments would have no effect on her ability to work, despite [purportedly] affording some weight to Dr. Tzetzo's opinion."   Plaintiff further argues that insofar as the ALJ should not have relied on the opinions of Gara and Campion, the ALJ's mental RFC finding essentially was based on his own lay opinion of the evidence, as opposed to competent medical opinion.   Plaintiff maintains that if the ALJ had properly weighed the medical opinions, he would have found that she had mental impairments that could not be accounted for by merely limiting her to simple work.

The ALJ, when making his RFC finding, discussed the evidence of record, including various medical opinions.[38] The ALJ observed that mental health treatment records indicate that Plaintiff had at times appeared anxious, constricted and depressed, and that she had exhibited some problems with concentration and memory at times, but that her pursuit of mental health treatment had been "conservative, routine and sporadic," and that she "engaged in significant activities of daily living." The ALJ further noted that psychiatric examinations in 2016 and 2018 had shown mostly normal findings. The ALJ stated that such findings, along with Plaintiff's extensive activities of daily living, such as traveling by herself to and from the Netherlands to visit her boyfriend, and making frequent trips between Buffalo and New Jersey, suggested that she was mentally capable of simple work. The ALJ further found that Plaintiff's statements about her symptoms were not entirely credible, for various reasons.

With regard to the opinion evidence, the ALJ indicated that he gave "partial weight" to the opinions of non-examining state agency review physicians Gara and Campion, that Plaintiff had moderate limitations but could perform simple, low-stress work, since their opinions were "generally consistent" with the record as a whole. However, the ALJ emphasized that he gave those opinions only partial weight since neither Gara nor Campion had examined Plaintiff. The ALJ indicated that he gave "some weight" to Tzetzo's psychological opinion, but not more, since it did not set forth functional limitations and suggested limitations that were inconsistent with Plaintiff's extensive daily activities, discussed earlier.

---

[38] Administrative Transcript at pp. 19–24.

17

Turning to Plaintiff's arguments, the Court finds that none of them have merit. First, Plaintiff's contention that the ALJ erred in giving "partial weight" to the opinions of Gara and Campion, amounts to an argument that an ALJ cannot assign any weight to the opinions of non-examining agency review physicians, which is incorrect. *See, e.g., Griffin v. Berryhill*, No. 16-CV-6440 CJS, 2017 WL 2403341, at *11 (W.D.N.Y. June 2, 2017) ("Defendant is correct that ALJs may, in proper cases, give more weight to the opinion of a non-examining consultant than to the opinion of treating physician. *See, Camille v. Colvin*, 652 Fed.Appx. at 28 (citing *Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995) for the proposition that "[t]he regulations . . . permit the opinions of nonexamining sources to override treating sources' opinions provided they are supported by evidence in the record."). Plaintiff's primary objection to those opinions is that neither was based on a personal examination of Plaintiff. However, where, as here, such opinions are consistent with the record as a whole, an ALJ does not err by assigning them weight.

Plaintiff's contention that the opinions of Gara and Campion were "stale" similarly lacks merit. Reversal may be appropriate where the Commissioner's decision to deny benefits rests on a consultative opinion that was "stale" because it was rendered on an incomplete record, particularly where subsequent developments in the medical evidence cast doubt on the accuracy of the opinion:

> In *Hidalgo v. Bowen*, under the regulations then in effect, the Second Circuit rejected an ALJ's decision that relied exclusively on the opinion of a non-examining consultant, in part because the non-examining physician reviewed a limited record that did not include subsequent clinical findings, such as clinical notes of a treating physician and hospital records including

> X-rays. *Id.*, 822 F.2d 294, 295–96, 298 (2d Cir. 1987). Because this subsequent evidence "confirmed" the RFC determination of the primary treating physician and "may have altered [the non-examining consultant's] conclusions," the Second Circuit remanded to the ALJ. *Id.* at 298. But in *Camille v. Colvin*, the Second Circuit reached the opposite conclusion in a non-precedential opinion, rejecting an argument that a non-examining source was "stale" solely because a non-examining source did not review later submitted evidence where "th[at] additional evidence does not raise doubts as to the reliability of [the non-examining source's] opinion." 652 F. App'x 25, 28 n.4 (2d Cir. 2016) (distinguishing *Hidalgo*, 822 F.2d at 295–96, 298). In that case, because the later opinion evidence did not differ materially from the opinions that the non-examining physician did consider, the Second Circuit found that the ALJ committed no error by relying on the non-examining physician. *Id.*

*West v. Berryhill*, No. 3:17-CV-1997 (MPS), 2019 WL 211138, at *5 (D. Conn. Jan. 16, 2019) (footnote omitted). In the instant case, the "additional evidence" cited by Plaintiff, namely, the report of one-time consultative examiner Tzetzo, does not, in the Court's view, raise doubts as to the reliability of the opinions of Gara or Campion. In that regard, while Gara and Campion may not have reviewed Tzetzo's report before they rendered their opinions, they did review reports of other Veteran's Administration doctors that were more restrictive than their own opinions,[39] and Plaintiff has not argued that those reports were significantly different than Tzetzo's report.

Finally, Plaintiff's contentions, that by limiting Plaintiff to simple work the ALJ "essentially found Plaintiff's mental impairments would have no effect on her ability to work," and that the ALJ relied on his own lay opinion when making the mental RFC finding, also lack merit.

---

[39] Administrative Transcript at pp. 102–103, 122–123.

19

CONCLUSION

For the reasons discussed above, Plaintiff's motion for judgment on the pleadings (ECF No. 8) is denied, Defendant's cross-motion (ECF No. 11) for the same relief is granted, and this matter is dismissed.   The Clerk of the Court is directed to enter judgment for Defendant and close this action.

So Ordered.

Dated: Rochester, New York
       September 28, 2020

ENTER:

*Charles J. Siragusa*
CHARLES J. SIRAGUSA
United States District Judge